## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

PHILIP O'NEAL,                          :
                                        :
     Plaintiff,                    :
                                        :        CASE NO.: 5:16-CV-519-MTT
v.                                      :
                                        :
NORFOLK SOUTHERN RAILWAY                :
COMPANY,                                :
                                        :
     Defendant.                    :

### PLAINTIFF'S BRIEF IN SUPPORT OF HIS MOTION TO EXCLUDE THE OPINION TESTIMONY OF DEFENDANT'S LIABILITY EXPERT LAURA WOJCIK, PH.D

COMES NOW Philip O'Neal, by and through undersigned counsel and files this Brief in Support of his Motion to Exclude the Opinion Testimony of Norfolk Southern Railway Company's ("NSRC") Liability Expert Laura Wojcik, Ph.D. ("Wojcik"), respectfully showing the Court as follows:

### Introduction

NSRC employee Philip O'Neal ("O'Neal") was injured on January 30, 2016 when he fell from a defective chair in the NSRC computer room in Valdosta, GA. After reporting the on-the-job injury, Defendant fired Plaintiff in retaliation for his reporting the unsafe defective chair and his resulting injury. Two co-workers, Engineer Michael Smith ("Smith") and Engineer Trainee Dominic Chisolm ("Chisolm"), saw O'Neal on the floor after the fall. Smith also saw O'Neal's left arm flying through the air through the open door to the computer room as O'Neal was falling.

Plaintiff filed his complaint alleging that Defendant violated the Federal Rail Safety Act (FRSA) 49 U.S.C. § 20109 by terminating him in retaliation for reporting the personal injury and

the broken chair.[1]  He also alleged a violation of the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51-60,[2] because NSRC had not inspected the defective chair since 2009, in violation of NSRC policy that required all office chairs to be inspected at least annually.

NSRC alleges that O'Neal is lying about falling out of the chair and that Smith is lying about seeing him on the floor after the alleged fall. With no percipient witness to support its defense, Defendant retained an engineering expert, Laura Wojcik, Ph.D. ("Wojcik") to attack the credibility of Smith and O'Neal with what she advances as an engineering analysis to explain that the fall could not have happened as O'Neal described and that Smith could not have seen what he saw.

Wojcik's analysis is fatally flawed, and her opinions are factually unsupported.  As such, Plaintiff now moves for an Order excluding all of her opinions contained in NSRC's expert disclosure pursuant to Federal Rule of Evidence 702 and Daubert because none of the opinions meet the relevancy and reliability requirements for expert witness testimony. Specifically, Plaintiff moves to exclude the following opinions:

1.    Given the established principles of mechanical and biomechanical engineering, it is extremely unlikely that Mr. O'Neal could have fallen in the manner in which he has described;

2.    Given the established principles of mechanical and biomechanical engineering, it is extremely unlikely that Mr. O'Neal could have acutely injured his lumbar discs in the falling incident he has described;

3.    Given the dimensions and layout of the locker room and computer room, it would have been impossible for Mr. Smith to see Mr. O'Neal from just inside the locker room's exterior door.  (See Exhibit A hereto).

---

[1] NSRC also terminated Smith.  His case is pending before this Court, Civil Action No. 5:16-CV-00520-MIT.  Separately, he has moved for Partial Summary Judgment.

[2] This motion relates to both the FELA and FRSA claims.

**Statement of Facts**

On January 30, 2106 Philip O'Neal, Locomotive Engineer Mike Smith, and Locomotive Engineer Trainee Dominic Chisolm reported for work at Norfolk Southern Railway Company's ("NSRC") train depot in Valdosta, GA at approximately 11:00 a.m.   (O'Neal Dep. 35-36). Plaintiff entered the building ahead of the other crewmembers and walked through the locker room and into the computer room where he attempted to scoot up and sit down in an office chair. (O'Neal Dep. 44, Exhibit 7 to O'Neal Dep.).   The seat was defective and came apart from the metal chair frame, causing Plaintiff to fall on the floor.   (O'Neal Dep. 44). Plaintiff fell backwards and landed on his left side on the floor.   (O'Neal Dep. 46-47; Exhibit 5 to O'Neal Dep.).   During the fall, he grabbed the desk behind him with his right hand and broke his fall "a little bit."  (O'Neal Dep. 49).

 Engineer Smith, who had entered the depot after O'Neal using the same route, heard a clattering sound coming from the computer room and looked into the open door in front of him and saw O'Neal's left arm fly into view and hit the floor of the computer room.  (Smith Dep. 37, 39, 41).  Smith walked into the computer room and saw O'Neal lying on the floor facing him with the seat broken away from the frame.  (Smith Dep. 39-40, 47; Exhibit 2 to Smith Dep.). Chisolm then walked into the computer room and saw the broken chair, loose screws on the floor, and O'Neal lying on the floor.  (Chisolm Dep. 25).

O'Neal got up, and Smith called Trainmaster Rodrea Booze ("Booze") to report the incident. (Smith Dep. 52-53).  O'Neal also spoke to Booze and told him that the chair had broken and that he was alright.  (O'Neal Dep. 32, 56-57; Exhibit 3 to O'Neal Dep.). O'Neal then called Booze back to request medical attention.   (O'Neal Dep. 67). Eventually, Booze arrived in

Valdosta and transported O'Neal to the South Georgia Medical Center where O'Neal was treated for injuries to his left side.  (Exhibit F hereto, medical records).

## I.      *Daubert* Standards for Admissibility of Expert Testimony

In determining the admissibility of expert testimony under the guidelines established by *Daubert*, a trial court must make a three-part inquiry, which includes consideration of whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; (3) the testimony assists the trier of fact through the application of scientific, technical, or specialized expertise to understand the evidence or to determine a fact in issue. U.S. v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004). These basic three requirements of qualification, reliability, and helpfulness are distinct concepts, and the burden of establishing each one rests with the proponent of the expert opinion. Id. Admissibility must be shown by a preponderance of the evidence. Allison v. McGhan Medical Corp., et al., 184 F.3d 1300, 1306 (11th Cir. 1999). "Any step that renders the analysis unreliable renders the expert's testimony inadmissible." Goebel v. Denver & Rio Grande Western Railroad Co., 346 F.3d 987, 992 (10th Cir. 2003).

Experts may be qualified by scientific training, education, or experience in a particular field. Frazier, 387 F.3d at 1260-1261. However, qualification by experience "does not mean that experience, standing alone, is a sufficient foundation rendering reliable *any* conceivable opinion the expert may express." Id. at 1261. If a witness chooses to rely solely or primarily on experience, the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. Id. The trial court cannot simply "take the expert's word for it." Id., citing Fed. R. Evid. 702 Advisory Committee Note (2000). Thus, federal caselaw demonstrates that one may

be considered an expert but still offer unreliable testimony. Id., quoting Quiet Technology DC-8, Inc. v. Hurel-Dubois UK, Ltd., 326 F.3d 1333, 1341-42 (11th Cir. 2003).

Therefore, "when faced with a proffer of expert scientific testimony, the trial court must first determine whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592-593 (1993). This requires an assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts at issue. Id.

Determining that the reasoning or methodology underlying the testimony is scientifically valid ensures that the evidence is reliable. The subject of the expert's testimony must be "scientific knowledge." In fashioning the Daubert guidelines, the United States Supreme Court noted that "the adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." Id. at 590. Thus, the Court identified four factors in Daubert that may be considered by a trial court in determining whether the reasoning and methodology underlying the expert testimony is scientifically valid. Those factors include the following: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. Id. at 593-594. In short, the focus of the trial court should be on the expert's principles and methodology rather than the conclusions generated. McDowell v. Brown, et al., 392 F.3d 1283, 1298 (11th Cir. 2004).

The four <u>Daubert</u> factors do not comprise a definitive checklist, and no one single factor is dispositive of reliability. In performing an analysis to determine whether expert testimony meets the reliability required under <u>Daubert</u>, a trial court may also consider the Advisory Committee's Notes to Rule 702. These factors are:

    (1)    Whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinion expressly for purposes of testifying;

    (2)    Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;

    (3)    Whether the expert has adequately accounted for obvious alternative explanations;

    (4)    Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting;

    (5)    Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

Fed. R. Evid. 702, Advisory Committee's Note (2000 Amends.) As noted by the court in *Bowers*, the list of factors in the Advisory Committee's Notes to Rule 702 are simply Illustrative of the issues a court may consider in evaluating an expert's testimony. <u>Bowers v. Norfolk Southern Corp.</u>, *et al.*, 537 F.Supp. 2d 1343, 1351 (2007).

An examination by the trial court of whether the expert testimony will assist the trier of fact to understand or determine a fact in issue ensures that the testimony is relevant. To assist the trier of fact, expert testimony must concern matters that are beyond the understanding of the average lay person. <u>Frazier</u>, 387 F.3d at 1262.  Expert testimony is also not helpful to the trier of fact if it lacks a valid scientific connection to the pertinent inquiry. In other words, the expert

testimony must "fit" with the facts of the case. <u>McDowell v. Brown</u>, <i>et al.</i>, 392 F.3d 1283, 1299 (11th Cir. 2004); <u>Daubert</u>, 509 U.S. at 591. Expert testimony lacks "fit" where a large analytical leap must be made between the facts and the opinion. <u>McDowell</u>, 392 F.3d at 1299; <u>General Electric Co., et al. v. Joiner</u>, 522 U.S. 136, 146 (1997). In fact, the Eleventh Circuit has noted that imprecise and unspecific expert opinions may even serve to confuse the jury and mislead it. <u>U.S. v. Frazier</u>, 387 F.3d 1244, 1266 (2004).

## II.    Argument

### A.    <u>Wojcik developed her opinions expressly for litigation as a 'hired gun.'</u>

The first factor in the advisory committee notes under Rule 702 asks "whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinion expressly for purposes of testifying."   Dr. Wojcik is a professional defense witness not affiliated with any academic institution who derives nearly 100% of her income from testifying.  (Wojcik Dep. 4-5). All of her presentations to lawyers have been to the defense bar.  (Wojcik Dep. 34).  She has previously testified for railroads, including Norfolk Southern and worked for members of the firm Hall, Bloch, Garland & Meyer. (Wojcik Dep. 5-7).[3] Before this case, the witness had never performed an analysis relating to a fall from a chair, and to her knowledge, no one else has either. (Wojcik Dep. 86).  Just like Dr. Wardell in <u>Bowers v. Norfolk S. Corp.</u>, 537 F.Supp. 2d 1343, 1354-1355 (2007), the witness fails the 'independence' factor under the advisory committee notes.

---

[3] She had billed NSRC $11,385 at the time of her deposition.  (Wojcik Dep. 9).

**B.**   **Wojcik was not careful in her work on this case.**

The fourth factor in the advisory committee notes under Rule 702 asks whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting. The district court must evaluate whether the "expert is a hired gun or a person whose opinion in the courtroom will withstand the same scrutiny that it would among his professional peers."   Watkins v. Telsmith, Inc., 121 F.3d 984, 991 (5th Cir. 1997). Wojcik fails the test because NSRC hired the witness on September 22, 2017, and she issued her report on October 8, 2017. (Wojcik Dep. 15). She never went to Valdosta because of time constraints.  (Wojcik Dep. 11).  She took no measurements or photographs, did not look at the broken chair, and did not know if the chair's frame was bent. (Wojcik Dep. 12, 13). She did not know that Chisolm was a witness or was ever in the depot. (Wojcik Dep. 58).  The witness rushed to form her opinions, did not do careful work, and as such, she was not as careful in this case as she would normally be in her professional work.  She fails the fourth factor under the advisory committee notes.

**C.**   **Wojcik's opinion that it is extremely unlikely that Mr. O'Neal could have fallen in the manner in which he has described is inadmissible.**

Dr. Wojcik acknowledged – as she must -- that the quality of her opinions are "only as good as the facts that [she] was presented with."  (Wojcik Dep. 68). To perform an analysis of the manner in which O'Neal fell, the witness had to have facts.  She needed to know precisely what O'Neal was doing and how he interacted with the chair to evaluate whether his version of events was supported by the science.  However, in the span of 4 pages of testimony, the expert admitted that **she does not know**: whether O'Neal got his hand to the desk behind him as he fell, how far O'Neal scooted before the chair broke, the angle at which the chair moved when O'Neal scooted forward, the position of the chair when he first encountered it, whether he moved the chair before he attempted to sit down, how effectively she chair slid on the floor when O'Neal

scooted, how close he got to the desk in front of him, whether he was holding the phone when the chair broke, where his hands were when he sat and scooted, his posture when he sat and scooted, whether he rotated to his left or right during the fall, where the chair was after the fall, where the seat was after the fall, in what manner the seat broke from the frame, the angle of the backrest, whether there was additional damage to the chair other than the seat coming off, whether the frame was bent, or whether O'Neal fell back before he went either left or right. (Wojcik Dep. 64-67). Then she admitted:

> Q: And in fairness to you, the reason you're not going to tell the jury any of those [facts] from a biomechanics expert point of view is you don't have enough facts to be able to plug into your analysis to get to those conclusions, true?
>
> A: That's right.  Again, without having cameras, we really don't know exactly how this happened.
>
> Q:  Well, what you could have had was very specific testimony on the very points that I'm asking about; is that true?
>
> A:  If there had been more specific testimony, then I would have taken it into consideration.

(Wojcik Dep. 67-68). To be clear, the witness' lack of factual information on these critical points was not due to evasion by O'Neal.  NSRC simply never asked him factual questions to provide answers upon which the witness could develop an admissible opinion.

Wojcik's opinion fails to meet the second factor under the advisory committed notes, which asks "whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion."  The alleged premise for the first opinion can be vaguely described as 'the witness could not have fallen as he described," is not a scientific premise at all.  Rather, the witness is advancing an opinion about how the incident *possibly* could (or could not) have happened, instead of what probably happened, and she created images and inserted them in her

report to support her opinion.  (Wojcik Dep. 45, 50, 53, 55, 59-60).[4]  She explained that she did

not have enough facts to render an admissible opinion and did the best she could with what she

had.  "*So the analysis that I've done here is **within the bounds of what I have**, and that's why

I've tried to give an idea of **possible envelopes**.*" (Wojcik Dep. 68).

Without the factual support to render an opinion about what probably happened,

Wojcik's testimony is too imprecise and unspecific to assist the tier of fact and loses all

relevance.  Fed. R. Evid. 401 and 402.  See, McDowell v. Brown, 392 F.3d 1283, 1299 - 1300

(11th Cir. 2004);  Bowers, 537 F.Supp. 2d 1343, 1368-69 (2007).

   **D.**     **Wojcik's opinion that it is extremely unlikely that Mr. O'Neal could have
              acutely injured his lumbar discs in the falling incident he has described is
              inadmissible.**

Wojcik did not have even a basic understanding of how the chair broke, how O'Neal's

body interacted with the chair as it broke, how he grabbed the desk behind him, or how he fell to

the floor, and as such, the witness cannot render this opinion. O'Neal was the only witness to the

chair breaking and fall itself (other than Smith seeing O'Neal's arm fly in the air and hit the

floor).  O'Neal testified that he caught the desk behind him on the way down as he fell,  (O'Neal

Dep. 49) but Wojcik ignores the testimony. (Wojcik Dep. 64). In addition, she found no medical

records to suggest that anything other than the fall caused Plaintiff's back pain.  (Wojcik Dep.

81).  She does not know whether Plaintiff's discs were healthy before the fall (Wojcik Dep. 83);

if O'Neal had any genetic factors that predisposed him to low back pain following a trauma

(Wojcik Dep. 87); or how much force Plaintiff was exposed to in the fall (Wojcik dep. 86)  She

could not identify any studies that address the likelihood of injury from a fall from a chair and

_____
[4] The citations refer to instances where the witness described her opinions in terms of
possibilities, not probabilities or where she simply admits that the images in her report do not
match with any probable scenario based on the facts.

could not remember ever working on a similar case involving a chair in the past. (Wojcik Dep. 85-86);

The reason that the witness does not know how O'Neal fell is because she has no facts. She does not know how the chair was positioned relative to the desk, the direction Plaintiff was scooting, if he was holding the telephone when he fell, whether he was sitting and scooting when the chair broke,[5] where Plaintiff's hands were, whether he caught himself on the desk behind him, where the chair ended up after the fall, or whether Plaintiff fell to his right or his left. (Wojcik Dep. 45, 47, 35, 36, 64, 56, 57).  She assumed that Plaintiff fell straight down out of the chair, but that assumption is directly contradicted by O'Neal's testimony that his body went backwards first.  (O'Neal Dep. 46-47).

Wojcik – who is not a medical doctor -- employed no methodology, much less a testable one. Just like Dr. Wardell in Bowers, the witness offered "no quantification, no parameters, no percentages, no numbers – nothing except dogmatic, but vague opinions."  Bowers, 537 F.Supp. at 1355. An expert must do more.  When rendering a causation opinion, the expert must account for obvious alternate explanations.  See, Bowers v. Norfolk S. Corp., 537 F.Supp. 2d 1343, 1356 (M.D. GA 2007).[6]  Plaintiff went to South Georgia Medical Center the day of the fall and reported pain in his left side, pain at the left shoulder, upper abdominal wall, left hip, iliac crest, and left anterior knee.  There was moderate tenderness to palpation over the left anterior thigh and left shoulder.  The discharge diagnosis was musculoskeletal pain, and Plaintiff was given Naprosyn.  (Exhibit A at 2).  There were no reported injuries to the right side.  (Wojcik Dep. 64).

---

[5] O'Neal testified that he was sitting and scooting up when the chair broke, and there is no evidence in the record to suggest otherwise.  (O'Neal Dep. 44).

[6] The causation standard in an FELA case is whether the railroad's negligence played any part, even the slightest, in producing the injury.  Rogers v. Missouri P. R. Co., 352 U.S. 500, 506 (1957).

With no clear understanding of how the fall occurred, no medical training, no established methodology, and no medical evidence to suggest that there are any alternate causes, the witness' opinion is inadmissible.

      **E.**    **Wojcik's opinion that given the dimensions and layout of the locker room and computer room, it would have been impossible for Mr. Smith to see Mr. O'Neal from just inside the locker room's exterior door is inadmissible.**

The factual support for this opinion is the worst of all three opinions. In essence, Wojcik says it is impossible – which she defines as very, very, very, very, unlikely – that Smith was in a position from which he could have seen O'Neal's arm fly in the air and hit the floor. (Wojcik Dep. 27). Logic dictates that she needed to know how far and at what angle Smith walked into the locker room to evaluate what he could have seen at the time of the fall. Stated differently, Wojcik needed to know as precisely as possible where Smith was in the building at the time of the fall in order to know what he could have seen.

Once again, the witness boldly asserted an opinion with no factual support. When asked how many feet Smith was in the locker room when he saw O'Neal's arm fly into the air she admitted that she does not have either an exact number or even a range. (Wojcik Dep. 18). Instead, she testified that he was "a couple of steps"[7] inside the building, but she could not quantify how far "a couple of steps" translated to in distance. (Wojcik Dep. 18, 19). She explained, [w]e don't have very good testimony, and most people are terrible at judging distances, especially when they're coming back and trying to describe something." (Wojcik Dep. 19). Again, she did not blame Smith for being evasive. Instead, the railroad failed to ask him to place himself on a photograph to show where he was when he saw O'Neal's arm flying in the air. (Wojcik Dep. 73). If NSRC had asked Smith the right questions, "that would have given

---

[7] NSRC never asked Smith about the pace at which he was walking or his stride length, meaning the witness cannot assign a precise distance to "couple of steps." (Wojcik Dep. 19).

us a better idea of possible sight lines… and helped narrow down possible sight lines." (Wojcik Dep. 73). With nothing to work with, other than vague, unspecific testimony, the witness gave up:

> Q:  Let's be clear. Yes or no; was Mr. Smith in a position to see any part of Mr. O'Neal's body at anytime when Mr. O'Neal was in the computer room?
>
> A:  I don't know.

(Wojcik Dep. 20). This admission alone provides sufficient grounds to exclude the opinion.

Wojcik had the ability to perform a professional, fact-based analysis that would be helpful to the jury, but she short-armed the task. (Wojcik Dep. 73). She could have gone to Valdosta with her equipment to "show visually what [Smith] likely would have been able to see as he walked toward the computer room." (Wojcik Dep. 73).  She explained exactly how to do it.  "If we wanted to … place someone at Point A, Point B, and Point C, then, sure, we can either do that with our computer model, you know, drop the camera in there at Mr. Smith's height and show this is what his eye view would have been, or we could actually go down to Valdosta and take pictures." (Wojcik Dep. 74).  Clearly, the witness was not as careful as she would be in her professional work outside litigation, and she fails to meet the fourth factor offered in the advisory committee notes to Rule 702.

By admitting that she did not know (1) how far Smith was in the locker room at the time of the fall, (2) the angle that Smith walked toward the computer room,[8] and (2) whether Smith was ever in position to see any part of O'Neal's body at any time when O'Neal was in the computer room, the witness herself admitted that her opinion is inadmissible.  (Wojcik Dep. 20).

---

[8] Wojcik admitted that it would be a "complete guess" about the angle that Smith took as he walked toward the computer room. (Wojcik Dep. 23).

**Conclusion**

The Court should exclude all three of Dr. Wojcik's opinions because none of the opinions have sufficient factual support to be relevant and helpful to the trier of fact. The witness rushed to perform an analysis -- clearly as a favor to one of her regular clients who faced a disclosure deadline. The result is that she did not go the scene or take any pictures or measurements. She could not evaluate the chair, the computer room or Smith's sight lines from her office in Michigan, so she relied entirely on the depositions, measurements, and photographs taken by counsel. At that point, she was stuck. NSRC did not develop the testimony of Smith and O'Neal[9] with sufficient detail for this witness – or any witness – to apply known scientific principles and reach an admissible engineering opinion.

WHEREFORE, Plaintiff moves this Court for an Order excluding the opinion testimony of Laura Wojcik, Ph.D.

This 28th day of November, 2017.

Respectfully submitted,
**STEEL & MOSS, LLP**

By: */s/ John A. Moss*
John A. Moss
Georgia Bar No. 526579

The Fountains at Piedmont Center
3495 Piedmont Road, NE
Building 11, Suite 905
Atlanta, Georgia 30305
(404) 264-1292 ph.
(404) 264-0161 fax

---

[9] Wojcik did not know that Chisolm was a witness and had been deposed at the time of her deposition. (Wojcik Dep. 58).

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that I have electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the following attorneys of record:

Mark E. Toth, Esq.
Amanda M. Morris, Esq.
Hall, Bloch, Garland & Meyer, LLP
P.O. Box 5088
Macon, Georgia 31208

This 28th day of November, 2017.

**STEEL & MOSS, LLP**

By: _/s/ John A. Moss_
John A. Moss
Georgia Bar No. 526579

The Fountains at Piedmont Center
3495 Piedmont Road, NE
Building 11, Suite 905
Atlanta, Georgia 30305
(404) 264-1292 ph.
(404) 264-0161 fax